IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2007

**STATE OF TENNESSEE v. CHARLES CURTIS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-07182     Chris Craft, Judge**

---

**No. W2006-02347-CCA-R3-CD  - Filed December 26, 2007**

---

A Shelby County Criminal Court jury convicted the appellant, Charles Curtis, of second degree murder and aggravated robbery, and the trial court sentenced him to consecutive sentences of thirty-six years and sixteen years, respectively.  On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions; (2) the trial court erred by allowing the appellant and one of his codefendants to be tried jointly; (3) the trial court erred by granting the State's motion to sequester the jury; (4) the trial court erred by admitting autopsy photographs of the victim's eyes into evidence; (5) his sentences are excessive; and (6) the cumulative effect of these errors denied him the right to a fair trial and due process.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Phyllis Aluko (on appeal) and Robert Felkner (at trial), Memphis, Tennessee, for the appellant, Charles Curtis.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michelle Kimbril-Parks and Alanda Dwyer, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The appellant and his codefendants, Willis Ayers and David Milken, were indicted for the first degree felony murder and especially aggravated robbery of Charlie Jackson, Jr.  The appellant and Ayers were tried jointly.  At trial, Christy Bernard testified that she was the victim's sister;  that the victim lived with their cousin, Angela Morton, at the time of his death; and that the victim drove

a burgundy Cadillac that was registered to Morton. Bernard last saw the victim alive between 7:00 and 7:30 p.m. on April 22, 2004, at Morton's house. The next day, Bernard learned that the victim had been killed. Two or three weeks later, Bernard learned from Sergeant Tim Sims that the victim's Cadillac had been recovered, and Bernard went to a downtown impound lot to see the car. Bernard said she worked and went to school at night. When the victim was alive, he picked up Bernard's children from school and took them to peewee football practice in the evenings. He kept their football equipment in the back of his car, and Bernard saw the victim put the equipment in the Cadillac's trunk on April 22. The victim's leather jacket was also in the trunk, but Bernard never saw the jacket again. She stated that the appellant was a member of the victim's "circle of friends."

Corey Smith testified that on April 22, 2004, he was at Monica Terry's and David Milken's apartment in the Summit Park apartment complex. Smith had gone there to play cards about 7:00 or 8:00 p.m. About one hour later, the appellant arrived and said he did not have anywhere to stay and needed money. The appellant used Milken's cellular telephone and the apartment's "house phone" to make some calls, but Smith did not hear the appellant's conversations. At some point, codefendant Willis Ayers arrived at the apartment with a book bag. He put the bag in Terry's and Milken's bedroom and went outside with the appellant. Smith and Terry also walked outside and stood at the top of the stairs while the appellant, Milken, and Ayers stood at the bottom of the stairs talking. About thirty or forty-five minutes later, a maroon Cadillac arrived, and the appellant got into the front passenger seat. The appellant and the Cadillac's driver sat in the car and talked for about twenty minutes. Meanwhile, Milken and Ayers were "in the dark part of the apartments, through the fence."

Smith testified that he saw Milken approach the Cadillac's driver's side and start talking to the driver, who was the victim. Milken started pulling on the victim and tried to pull the victim out of the car by his neck. The car began to jerk, and its brake lights came on "like [the victim] was trying to pull it out of gear." Ayers approached the driver's side of the car, pulled out a gun, and shot the victim. The victim fell, and Milken pushed him over and got into the driver's seat. The appellant got out of the front passenger seat and got into the back passenger seat, and Ayers went back into Terry's and Milken's apartment. Smith saw the Cadillac leave the apartment complex, and he went into Terry's and Milken's apartment. He saw Ayers go into the bedroom and put the gun in the book bag. Smith asked Ayers why he had shot the victim, and Ayers said that it was an accident and that the victim had been reaching for a gun.

Smith testified that about thirty or forty-five minutes later, the appellant and Milken returned to the apartment complex in the Cadillac and that the victim was not in the car. The appellant told Smith that it was time for him "to put in some work," but Smith told the appellant that he did not want anything to do with the shooting. The appellant said bad things about Smith, and Smith went outside with the appellant. The appellant opened the Cadillac's trunk and gave Smith two helmets and some shoulder pads. Smith put the equipment and a leather jacket in Terry's and Milken's apartment. The appellant told Smith that he had taken twenty dollars and some drugs off the victim, and Smith saw the appellant cook some cocaine on the stove. Smith then left with the appellant and Milken in the Cadillac, and Milken drove them to an insurance company building about one-half

mile away from the apartment complex. Smith poured lighter fluid on the back seat of the Cadillac, and the appellant set the car on fire. After disposing of the vehicle, the three men returned to Milken's apartment and played cards.

On cross-examination, Smith testified that he did not know who the appellant spoke with over the telephone. He stated that he did not know what time the Cadillac first arrived at the apartment complex but that he and Monica Terry went outside about 9:00 or 10:00 p.m. and that the Cadillac arrived about twenty minutes later. The area was dark, but porch lights were on, and Smith could see clearly what was going on in the car. He stated that Milken started the scuffle with the victim, that Ayers had a small gun, and that he did not see the appellant with a gun. He stated that the victim may have struggled with Milken for ten minutes before the shooting and that the victim was facing forward when Ayers shot him. Smith had never seen the victim or the Cadillac before, and the appellant did not appear to argue with the victim. Smith said that he did not telephone the police because he did not want anything to do with the shooting and that he put lighter fluid on the car's back seat because he was nervous. At some point, Smith talked with Sergeant Tim Sims, and Sergeant Sims told Smith that Smith would not be charged with burning the car if Smith would give a statement. Smith agreed to give a statement about the shooting. He acknowledged reading over his statement before trial and that it helped him remember some of the facts about the case. He also acknowledged that he had a prior conviction for theft and that he had a little involvement in the victim's death.

Officer Jeff Sealey with the Memphis Police Department testified that he was patrolling Will Carruthers Park in the early morning hours of April 23, 2004. He saw the victim lying in the parking lot, approached him, and noticed that the victim's face was bloody. The victim did not have a pulse, and Officer Sealey called for an ambulance.

Officer Marlon Wright of the Memphis Police Department's Crime Scene Investigation Unit went to the park shortly after midnight on April 23. An African-American male was lying on his back and appeared to have a gunshot wound to the head. The victim's pants pocket was turned inside out, and he looked like he may have been dragged from one point to another. A cellular telephone was broken into pieces, and the victim's driver's license was in a grassy area. Eleven cents was in the victim's pocket, and a dime was next to his left leg. The police did not find a wallet.

Officer Bryan Davis of the Memphis Police Department testified that about 1:00 a.m. on April 23, he received a call about an abandoned vehicle at 4222 Milbranch Road. He saw a burned vehicle behind a building, "ran the tags," and had the vehicle towed to the city impound lot. A computer check revealed that the car belonged to Angela Morton. Officer Davis stated that the Summit Park apartments were directly behind the building where the car was recovered.

Angela Morton, the victim's cousin, testified that in April 2004, the victim was living with his sister. On the day of the victim's death, Morton and the victim had been at the football field and then went to Morton's home. About 8:00 p.m., the victim told Morton that he was going to their cousin's house and left in Morton's Cadillac. The next day, Morton learned from Sergeant Tim Sims

that the victim had been killed. At some point, Morton went to the city impound lot to get some football equipment out of the car. However, the equipment was missing. The victim carried a cellular telephone that was registered to Morton, and the number for the phone was 281-1595. On cross-examination, Morton testified that to her knowledge, the victim did not carry a wallet and kept his money in his pocket.

Lakeshea Cobb testified that she dated the appellant for a few years but was not dating him in April 2004. One night in April 2004, Cobb was at Marlowe's bar and received a telephone call from the appellant. The appellant came to the bar, and Cobb noticed a couple of specks of blood on his white t-shirt. Cobb asked the appellant about the blood, and he told her that he had gotten into a fight and that his nose was "busted . . . or something." However, Cobb saw nothing wrong with the appellant's nose. The appellant then told her that he shot somebody. Cobb looked shocked, and the appellant said, "[G]irl, quit playing, you know I would do no shit like that." The appellant had a friend with him, and the two men left the bar in a long car like a Chevrolet or a Cadillac. About two weeks later, Cobb and the appellant met and went to a gas station. The appellant told Cobb that he was "feeling heavy about something" and that he had shot the victim, who Cobb knew as "Big Daddy." Subsequently, Sergeant Tim Sims contacted Cobb, and she gave him a statement on June 19. Cobb also picked out David Milken's photograph from a photographic array and identified him as having been with the appellant at Marlowe's bar. At some point, the appellant contacted Cobb and told her to get rid of some football equipment he had given her. However, Cobb contacted the police, and someone from the police department came and got the equipment.

On cross-examination, Cobb testified that the appellant may have told her that he was with a person when the person shot the victim, not that the appellant shot the victim. She stated that Sergeant Sims drowned in a lake in September 2004 and acknowledged that she was with Sims on a boat at the time of his death. She stated that Sergeant Sims was married and had two or three children but that she was not involved in a relationship with him. Cobb said she did not know Willis Ayers.

Ernestine Davison of the Memphis Police Department testified that she assisted Sergeant Tim Sims with taking Lakeshea Cobb's statement. Davison typed Cobb's statement verbatim, and Cobb made corrections, initialed each page, and signed the statement. On cross-examination, Davison said that according to Cobb's statement, the appellant shot the victim because the victim "shorted him on some dope."

Tabatha Bender, the Operations Manager for Cricket Communications, testified that she maintained telephone records for the company and obtained the records for Angela Morton's cellular telephone. At 10:25 and 11:37 p.m. on April 22, telephone calls were made from Morton's phone to 345-6195. At 12:29:11 and 12:29:26 a.m. on April 23, the phone received calls from 345-6195.

Sergeant Anthony Mullens of the Memphis Police Department testified that he investigated the victim's death and that Sergeant Tim Sims was the case coordinator. Sergeant Mullens retrieved the broken telephone recovered from the park and learned the phone belonged to Angela Morton.

-4-

The victim's fingerprints were on the phone. Sergeant Mullens also learned that 345-6195 was Monica Terry's telephone number. He went to her apartment to speak with David Milken and arrested Milken. Sergeant Mullens also went with other officers to Lakeshea Cobb's home. Cobb told them the appellant had seen her at a bar, appeared to have blood on his shirt, and told her that he had shot someone and had taken the person's car. However, Cobb stated that the appellant claimed to be joking. Cobb told the officers that the appellant left the bar in a brown or burgundy car, possibly a Cadillac. On cross-examination, Sergeant Mullens testified that Sergeant Sims died in August 2004 and that the investigation of the victim's death was over by that time.

Assistant Medical Examiner Tom Deering testified that he performed the victim's autopsy. The victim was thirty-one years old at the time of his death; was six foot, four inches tall; and weighed three hundred eighteen and one-half pounds. The victim had a gunshot wound to the forehead, two swollen black eyes, and a bloody nose. Dr. Deering found stipple on the victim's forehead and surrounding the gunshot wound and concluded that if a handgun was the murder weapon, then the gun was no more than two feet away from the victim when it was fired. He stated that stipple was also in the victim's eyes, indicating that his eyes were open when he was shot and that he was facing the shooter. The bullet traveled front to back, and Dr. Deering recovered it in the back of the victim's head. He stated that the victim would have been unconscious immediately after the shooting but could have lived for seconds, minutes, or a little longer. Testing revealed that the victim's alcohol level was .039 percent and that he had been exposed to marijuana sometime before his death. The victim had two abrasions on the back of his left wrist. Dr. Deering concluded that the manner of the victim's death was a homicide and that the cause of death was a gunshot wound to the forehead. On cross-examination, Dr. Deering stated that the victim's black eyes could have resulted from the gunshot wound. Dr. Deering did not see any cuts or abrasions on the victim's face to indicate he had been in a fight. The State rested its case.

The appellant testified on his own behalf that in April 2004, he lived with his aunt. On April 22, he went to David Milken's apartment between 8:00 and 9:00 p.m. Corey Smith, Monica Terry, Milken, and a woman named Glenda were there. The appellant used Milken's cellular telephone to call Lakeshea Cobb's answering machine. The appellant listened to Cobb's messages and heard a male voice. He then called Cobb and argued with her over the telephone for thirty to forty-five minutes. When the cell phone's battery quit working, the appellant used the house phone. He telephoned the victim and told him to come to Milken's apartment. The appellant stated that he and the victim were friends and that he wanted the victim to drive him to Marlowe's bar to see if a man was with Cobb.

The appellant testified that the victim drove to the Summit Park apartment complex and that he sat in the car with the victim for three to ten minutes. The victim left and went to Rally's restaurant to get the appellant something to eat. The victim returned to the apartment complex, and the appellant sat with the victim in the Cadillac for about ten to twenty minutes. David Milken walked passed the Cadillac, and the victim asked the appellant about Milken. Milken returned to the car, and the victim became nervous. Milken reached into the Cadillac, grabbed the victim in a choke hold, and tried to pull the victim out of the car. The appellant grabbed Milken's arm and said,

-5-

"[T]his my guy, this my guy," meaning that the victim was the appellant's friend. Willis Ayers approached the car's passenger side and put a .380 automatic pistol through the window. The appellant hit Ayers' arm, and "the gun went off." The appellant knew Milken but did not know Ayers.

The appellant testified that the victim fell forward onto him and that he jumped out of the car and got into the back seat. Ayers ran away, and the appellant and Milken drove to the baseball park. The appellant stated that he would not allow Milken to burn the victim's body and that they dropped off the victim's body at the park and took the victim's car. Milken drove the car to Marlowe's bar, and the appellant spoke with Cobb. He told her that he had shot someone, and he and Milken drove back to Milken's apartment. Milken opened the trunk of the car and gave the appellant and Corey Smith some shoulder pads and a coat. Smith put the items in Milken's apartment, and Smith and the appellant drove the Cadillac to an insurance building. There, Smith "sprayed the car down and lit it." The appellant went to a hotel and did not return to Milken's apartment. The appellant stated that he gave two statements to the police. After speaking with Sergeant Tim Sims, the appellant telephoned Cobb and told her to get rid of some shoulder pads he had given her. The appellant stated that he did not know what Milken and Ayers were going to do on the night of April 22 and that he did not plan their crimes. However, he admitted that he helped dispose of the victim's body and that he took the football equipment. The appellant acknowledged that he had prior convictions for felony theft and drug possession.

On cross-examination by codefendant Ayers' attorney, the appellant testified that he did not lure the victim to the apartment with the purpose of robbing and killing him. He also did not tell Smith earlier that evening that he needed money, and he said Smith was lying. He stated that if he had not hit Ayers' arm, the gun would not have fired. At the time of the shooting, the victim was facing the appellant and the passenger side of the car, and the victim's back was against the driver's side window. The appellant was turned toward the victim. The appellant acknowledged that he and the victim were good friends. He stated that he did not telephone 911 and made no effort to resuscitate the victim, and he said that his reaction to the shooting was to "[c]lean up the mess." After the shooting, the appellant panicked and got into the car's back seat. Milken got into the driver's seat and drove the car to the ballpark. Milken pulled the victim's body out of the car and smashed the victim's cellular telephone onto the ground. Smith later drove the Cadillac to the insurance company building and burned the car. The appellant never told Cobb he shot the victim, but he did tell her over the phone after he was arrested that he was "caught up in a murder charge [he] didn't know anything about." The appellant stated that he did not take cocaine off the victim and cook it, and he denied shooting the victim because the victim "shorted" him on some drugs.

On cross-examination by the State, the appellant acknowledged that he is known as "Day-Day." He said that he knew the victim sold drugs and that he had purchased cocaine from the victim previously. After the shooting, Ayers went back into Terry's and Milken's apartment, but the appellant did not see Ayers again. The appellant and Milken drove to Marlowe's bar, and the appellant spoke with Cobb. The appellant told Cobb he shot someone in order to scare her. About two weeks after the shooting, the appellant gave some football equipment to Cobb.

-6-

Kaylyndra Ayers, codefendant Willis Ayers' sister, testified for her brother that about one year before trial, Corey Smith contacted her and told her that he wanted her to take him to Willis Ayers' attorney's office. Kaylyndra Ayers and Smith went to the attorney's office and spoke with a paralegal. Smith told the paralegal that Willis Ayers did not shoot the victim and was upstairs with Smith at the time of the shooting.

On cross-examination by the State, Kaylyndra Ayers testified that she had never met Smith before and that they went to the attorney's office the day before her brother's preliminary hearing. She stated that she had not discussed the case with her brother and that his attorney was not present when Smith talked with the attorney's paralegal. She acknowledged that she attended her brother's preliminary hearing, that Smith testified at the hearing, and that she was surprised by his testimony at the hearing. On cross-examination by the appellant, Kaylyndra Ayers testified that she loved her brother but would not lie for him. She acknowledged that she never told police Smith had changed his story. She said she did not remember Smith refusing to sign the statement that the paralegal had written.

Patricia Marchbanks testified that she used to work as a paralegal for Willis Ayers' attorney. Corey Smith and Kaylyndra Ayers came to the attorney's office, and Smith gave a statement to Marchbanks. Smith told Marchbanks that the police had changed his statement, that Willis Ayers was in David Milken's apartment at the time of the shooting, and that he never saw Ayers shoot the victim. Marchbanks took notes and planned to type Smith's statement and have him sign it. However, Smith refused to sign a written statement.

On cross-examination by the State, Marchbanks testified that prior to her meeting with Kaylyndra Ayers and Smith, she had spoken with Kaylyndra over the telephone a couple of times about Willis Ayers' case. Marchbanks said that Smith gave his statement to her just before Willis Ayers' preliminary hearing and that Smith's testimony at the hearing was different than what he told her.

The appellant and Willis Ayers had been charged with first degree felony murder and especially aggravated robbery. The jury convicted the appellant of second degree murder and aggravated robbery and convicted Ayers of second degree murder and facilitation of especially aggravated robbery.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions because it fails to show that he killed the victim knowingly or that he knew his codefendants intended to rob and kill the victim. He also contends that the evidence is insufficient to support the aggravated robbery conviction because no one saw him with a gun and the evidence does not show that he knew Ayers had a gun. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is the knowing killing of another. See Tenn. Code Ann. § 39-13-210(a)(1). Tennessee Code Annotated section 39-11-302(b) defines the culpable mental state of knowing as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann.§ 39-13-401(a). As instructed by the trial court in this case, aggravated robbery is robbery accomplished with a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1).

We note that the trial court also instructed the jury on the theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that a person is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."

Taken in the light most favorable to the State, the evidence is sufficient to support the convictions. The appellant has not provided this court with opening and closing statements. However, after the State rested its case, the appellant made a motion for judgment of acquittal. In arguing against the motion, the State explained that its theory of the case was that the appellant lured

the victim to the apartment complex with the intent to have David Milken and Willis Ayers help him rob the victim and that the victim was killed during the robbery. The evidence at trial revealed that the appellant arrived at Milken's apartment and announced that he did not have a place to stay and needed money. The appellant knew the victim sold drugs and telephoned the victim twice, asking him to come to the apartment complex. The appellant went outside with Milken and Ayers, and Smith heard the three men talking. When the victim arrived, Smith saw the appellant get into the car with the victim and saw Milken and Ayers go to a dark part of the complex. While the appellant talked with the victim, Milken approached the victim's car, grabbed the victim by the neck, and tried to pull the victim out of the car. Smith also saw Ayers approach the car and shoot the victim in the head.

After the shooting, Ayers returned to Milken's apartment, and Milken pushed the victim over and got into the driver's seat of the victim's Cadillac. The appellant, despite claiming to have no knowledge of what Milken and Ayers were planning to do to his friend, did not attempt to seek help for the victim. Instead, he got into the back seat of the Cadillac and went with Milken to dispose of the victim's body. Milken then drove the appellant to Marlowe's bar, where the appellant confessed to Lakeshea Cobb that he had participated in shooting the victim. The appellant and Milken returned to the apartment complex, and the appellant took the football equipment out of the Cadillac's trunk and eventually gave it to Cobb. He told Smith that he had taken money and drugs off the victim, and the police later found the victim with his pockets turned inside out and almost no money on him. The appellant, Milken, and Smith drove the victim's car to an insurance building nearby, set the car on fire, and returned to Milken's apartment to play cards. From this evidence, we conclude that the jury reasonably could have found that the appellant and his codefendants concocted a plan to rob the victim at gunpoint and that the appellant shared in his codefendants' intent to commit the crimes. Moreover, "[w]hen one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other." State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000). The evidence is sufficient to support the convictions.

## B. Joint Trials

The appellant contends that the trial court erred by granting the State's motion to consolidate his case with codefendant Ayers' case because he and Ayers presented "antagonistic defenses" and because it caused his trial to be delayed for four months, resulting in a violation of his right to a speedy trial. The State argues that while the appellant and his codefendant tried to blame each other for shooting the victim, "the trial court was careful to not allow evidence that was admissible against one to unfairly prejudice the other." As to the appellant's claim about a speedy trial violation, the State argues that a four-month delay alone does not establish such a violation and that the appellant has failed to show any prejudice. In his reply brief, the appellant argues that he was prejudiced by his joint trial with Ayers because Ayers' attorney "emphasized" that the appellant told Cobb he shot the victim and because Kaylyndra Ayers and Patricia Marchbanks testified for codefendant Ayers that Corey Smith claimed Ayers did not shoot the victim, implying that the appellant was the shooter.

The appellant contends that had his trial been severed from Ayers' trial, such damaging testimony would not have been presented.

The record reflects that in September 2004, David Milken, Willis Ayers, and the appellant were jointly indicted for killing and robbing the victim. In November 2004, the appellant filed a motion to sever his trial. Nothing in the record definitively reflects that the trial court ever ruled on the motion. Nevertheless, Milken was tried separately from Ayers and the appellant, and a jury convicted him of first degree felony murder and especially aggravated robbery. See State v. David Milken, No. W2006-01850-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 754 (Jackson, Sept. 21, 2007). In February 2006, the State filed a motion to consolidate the appellant's and Ayers' trials, and the appellant filed a motion in opposition to the consolidation. On March 10, 2006, the trial court held a hearing on the State's motion to consolidate. At the hearing, the trial court noted that it had never granted a motion to sever in the case. The prosecutor explained that based on David Milken's statement to police, Milken had been tried separately from his codefendants because "[t]here was no way we could try him with a co-defendant." The trial court then concluded that because no motion to sever had been granted in the first place, there was no need to rule on the State's motion to consolidate. However, the trial court noted that the appellant had filed a motion to sever previously and asked Ayers' attorney if he also wanted to file a severance motion. Ayers' attorney said yes, and the trial court continued the severance hearing for one week in order to give Ayers' attorney time to file a written severance motion.

At the March 17 hearing on the defendants' severance motions, the State informed the trial court that although the appellant and Ayers had given statements to the police, the State did not intend to use the statements at trial and, therefore, separate trials were unnecessary. The State also informed the trial court that although the appellant was scheduled to go to trial in late March, it needed to move the appellant's trial to July because Lakeshea Cobb was serving in the military in Germany and could not return to the United States in time for the trial. The appellant's attorney argued that the trials should be severed due to "finger pointing" between the defendants and because trying the defendants jointly would cause a delay. Counsel informed the trial court that the appellant was ready to go to trial as scheduled. The trial court ruled that "merely pointing the finger at each other would not fall into the criteria where I would need to sever this case" and denied the defendants' motions to sever. The trial court also rescheduled the joint trial for July.

Tennessee Rule of Criminal Procedure 14(c)(2)(I) provides that a trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." As noted in the State's brief,

> [w]hile "mutually antagonistic" defenses may mandate severance in some circumstances, they are not prejudicial per se." State v. Farmer, et al., No. 03C01-9206-CR-00196, [1993 Tenn. Crim. App. LEXIS] ([Knoxville,] July 8, 1993) citing Zafiro v. United States, 506 U.S. 534, 537-38, 113 S. Ct. 933, 937, 122 L. Ed. 2d 317 (1993). Due to the difficulty in establishing prejudice, relatively few

convictions have been reversed for failure to sever on these grounds. Id. Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. Id. "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." Id. quoting United States v. Horton, 705 F.2d 1414, 1417 (5th Cir. 1983).

State v. Ensley, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996). Whether to grant a severance lies within the sound discretion of the trial court. State v. Meeks, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981)). This court will not find an abuse of the trial court's discretion unless the record clearly shows that the defendant was so prejudiced by the joint trial that the granting of a severance became a judicial duty. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

The evidence in the present case was more than sufficient to support the appellant's guilt, regardless of who actually shot the victim. Moreover, although codefendant Ayers tried to convince the jury that the appellant was the trigger-man, the fact that the jury found the appellant guilty of the lesser included offenses of second degree murder and aggravated robbery demonstrates that the jury carefully considered the evidence and convinces us that the appellant was not prejudiced by being jointly tried with Ayers.

As to the appellant's claim that allowing the State to try him jointly with Ayers resulted in a speedy trial violation, this court must conduct the balancing test set forth in Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182 (1972), to determine whether a defendant's constitutional right to a speedy trial has been violated. State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996); State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981); State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973). Under the Barker analysis, the following four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. Barker, 407 U.S. at 530, 92 S. Ct. at 2192.

The record reflects that the appellant was indicted for the offenses in September 2004 and was ultimately scheduled to go to trial in late March 2006. It was only when the State filed its motion to consolidate in February 2006 that the appellant argued his right to a speedy trial would be violated if the trial court granted the State's motion. At the motion hearing on March 17, 2006, the State informed the trial court that it also was going to request a continuance in the appellant's case because the State intended to call Lakeshea Cobb as a witness and she could not get back to Tennessee in time for the trial in late March.

Although the appellant asserted his right to a speedy trial, the fact that he failed to do so until the State filed its February 2006 motion means that this factor does not weigh heavily in his favor. Moreover, the actual delay he complains about was only four months. The State's reason for the delay was to procure the testimony of an important witness, and the appellant has failed to explain how he was prejudiced by the delay, particularly how the delay impaired his ability to present a

defense. See State v. Vance, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994) (stating that the "single most important factor is whether the defendant was prejudiced by the delay, and the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense'). Thus, we conclude that the appellant is not entitled to relief.

## C. Jury Sequestration

The appellant claims that the trial court erred by granting the State's motion to sequester the jury. The State contends that the appellant is not entitled to relief because the record does not reflect that he objected to the State's motion and because he has failed to show that he was prejudiced by the jury's sequestration. We agree with the State.

Tennessee Code Annotated section 40-18-116 provides that "[i]n all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." The trial transcript reflects that on the first day of trial, a sequestered jury was requested. However, the transcript does not reflect which party requested sequestration or whether the other party objected to the request. Furthermore, no discussion regarding jury sequestration is in the transcript. The trial court also filed a written order, stating that it was granting a request to sequester the jury. However, the order also fails to identify which party requested sequestration, whether the other party objected, and on what grounds the trial court granted the request. Therefore, the State is correct that the appellant has waived this issue. See Tenn. R. App. P. 24 (providing that it is the appellant's duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review); Tenn. R. App. P. 36(a) (providing that the failure to make a contemporaneous objection waives the issue). Moreover, the appellant has failed to show how sequestration of the jury prejudiced his case. Thus, he is not entitled to relief. See Tenn. R. App. P. 36(b).

## D. Autopsy Photographs

The appellant contends that the trial court erred by admitting autopsy photographs of the victim's eyes into evidence, arguing that the prejudicial effect of the photographs outweighed their probative value. The State contends that the trial court did not err by admitting the photographs. We agree with the State.

During the trial, the defense objected to the State's plan to introduce into evidence two autopsy photographs of the victim's eyes. Each close-up photograph showed one of the victim's eyes being held open by gloved fingers. The State argued that the photographs should be admitted into evidence during Dr. Deering's testimony because they showed stippling, indicating that the victim had his eyes open and was looking at the shooter when he was shot. The trial court ruled that the photographs were "very probative in showing the gunpowder impacts in the whites of the eyes" and in showing that the victim's eyes were open at the time of the shooting. The trial court also ruled that the photographs were not very prejudicial and concluded that they were admissible.

-12-

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court, and that ruling will not be overturned on appeal absent a showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "Autopsy photos should be particularly scrutinized because 'they present an even more horrifying sight and show the body in an altered condition.'" State v. Price, 46 S.W.3d 785, 815 (Tenn. Crim. App. 2000) (quoting State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)).

We agree that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice to the appellant. During his testimony, Dr. Deering testified that he found stipple in the victim's eyes, indicating that the victim's eyes were open at the time of the shooting and that he was looking at the shooter. The State showed the two photographs to the jury, and Dr. Deering pointed out the stipple marks in the victim's eyes to the panel. We conclude that the photographs assisted the jury in understanding Dr. Deering's testimony. Furthermore, the photographs were not gruesome. Therefore, the trial court did not abuse its discretion by admitting the photographs into evidence.

### E. Excessive Sentencing

The appellant claims that the trial court erred by improperly enhancing his sentences pursuant to Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), and by ordering that he serve his sentences consecutively. The State concedes that the trial court improperly applied one enhancement factor but argues that the appellant's prior criminal record justified the enhancement of his sentences. The State also argues that the trial court properly ordered the appellant to serve his sentences consecutively. We conclude that the appellant's sentences are not excessive.

At the sentencing hearing, no witnesses testified, but the State introduced the appellant's presentence report into evidence. According to the report, the then thirty-three-year-old appellant was single with two teenage daughters. The appellant reported that he was in excellent physical and mental health and that he did not use alcohol or illegal drugs. The report shows that the appellant dropped out of high school in the tenth grade and that he worked as a packer for Technicolor from January 2002 to January 2003, as a stacker for Maxi Foods from January 2001 to December 2001, and as a dishwasher for Kirby Pines from July 1993 to August 1993. According to the report, the appellant has prior misdemeanor convictions for assault, marijuana possession, disorderly conduct, attempting to commit an undefined felony, two counts of theft of property valued more than five hundred dollars but less than one thousand dollars, and five counts of driving on a revoked or suspended license. The State also introduced into evidence certified copies of the appellant's felony

convictions for possession of cocaine with intent to sell, aggravated assault, theft of property valued over ten thousand dollars, and facilitation of aggravated robbery.

The trial court concluded that two of the appellant's felony convictions qualified him as a Range II, multiple offender and that his remaining two felony convictions and various misdemeanor convictions justified the application of enhancement factor (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," to his sentences. Tenn. Code Ann. § 40-35-114(1) (2006). The trial court gave "fairly good weight" to factor (1), stating that "although the driving on [a] revoked license convictions aren't that serious there's just a steady stream of them basically just meaning he doesn't care what the law is." The trial court also applied enhancement factor (9), that the appellant "possessed or employed a firearm . . . during the commission of the offense," to his sentence for second degree murder. Tenn. Code Ann. § 40-35-114(9) (2006). The trial court noted that the appellant's presumptive sentence for the second degree murder conviction, a Class A felony, was thirty-two and one-half years, the midpoint in the range, and enhanced his sentence to thirty-six years. See Tenn. Code Ann. § 40-35-112(b)(1), -210(c) (2003). The trial court also noted that the appellant would have to serve the sentence at one hundred percent. See Tenn. Code Ann. § 40-35-501(i)(1), (2)(B). For the aggravated assault conviction, a Class B felony, the trial court noted that the appellant's presumptive sentence was twelve years, the minimum in the range, and enhanced the sentence to sixteen years. See Tenn Code Ann. § 40-35-112(b)(2), -210(c) (2003).

Regarding consecutive sentencing, the trial court stated that the appellant was "constantly getting into trouble" and "unwilling to lead a productive lifestyle" and that his extensive criminal history justified consecutive sentencing. See Tenn. Code Ann. § 40-35-115(b)(2). The trial court also stated that "looking at the nature of his prior convictions [and] the facts of this case I do find from this case that he is a dangerous offender." The trial court said that it believed some of the appellant's prior felony convictions made it necessary to protect society from him and that "the circumstances surrounding the commission of this offense are aggravated as far as the murder second and the aggravated robbery, the car, the whole thing, the fact that it was just done with people watching." Thus, the trial court also applied consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(4), the dangerous offender provision.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately

considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant first contends that the trial court improperly applied enhancement factor (9), that he used a firearm during the commission of the offenses, because application of that factor violates Blakely. The State agrees that Blakely prohibited the application of that enhancement factor but argues that the appellant's extensive criminal history alone justified enhancing the appellant's sentences pursuant to enhancement factor (1). We agree with the State. The appellant's four prior felony convictions and multiple misdemeanor convictions were entitled to significant weight and justified the trial court's enhancing his sentences above the presumptive punishment.

We note that the appellant argues for the first time in his appellate brief that the trial court should have mitigated his sentences because he did not allow David Milken to burn the victim's body, played a minor role in the commission of the offenses, and did not participate in Milken's and Ayers' physical attack of the victim. See Tenn. Code Ann. § 40-35-113(13). However, the appellant did not make this argument to the trial court, and we conclude that none of these factors should mitigate the appellant's sentences.

Regarding consecutive sentencing, the appellant contends that consecutive sentencing was not proper in this case because many of his prior convictions are misdemeanors and traffic offenses and because "there is insufficient evidence that [he] has a sufficiently extensive record of criminal activity to warrant consecutive sentencing." He also argues that the trial court failed to recite facts of the case in support of its finding that he is a dangerous offender.

Tennessee Code Annotated section 40-35-115(b)(4) provides that a trial court may impose consecutive sentences if a defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our supreme court held that satisfying Tennessee Code Annotated section 40-35-115(b)(4), by itself, is not sufficient to sustain consecutive sentences. If the defendant is found to be a dangerous offender under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant, the "Wilkerson factors." Wilkerson, 905 S.W.2d at 938. Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

The record reflects that the appellant has been committing misdemeanor and felony crimes since he was eighteen years old, and this extensive criminal history alone justifies consecutive sentencing in this case. As for his being a dangerous offender, the trial court specifically stated that society needed to be protected from the appellant. The trial court also stated that it was troubled by the aggravated nature of the crimes and the fact that the appellant committed the crimes while people were watching, demonstrating that the trial court believed consecutive sentencing was related to the

-15-

severity of the offenses.  We conclude that the trial court properly ordered the appellant to serve his sentences consecutively.

### F.  Cumulative Errors

Finally, the appellant contends that the cumulative effect of the errors in this case deprived him of his rights to a fair trial and due process.  However, we find no merit to this claim.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE